## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **CARMEN DE LOURDES CAEZ**<br><br>Plaintiff<br><br>Vs.<br><br>**UNIVERSIDAD DE PUERTO RICO, WALTER MUCHER,  JANE DOE,** and their conjugal partnership, **WILLIAM RIOS, SUSAN ROE,** and their conjugal partnership; **CORPORATION ABC, INSURANCE COMPANY DEF,** and **JOHN DOE**<br><br>Defendants | **CIVIL NO. 23-**<br>        **FOR:**<br>                DISCRIMINATION<br>                 EMPLOYMENT<br>                 RETALIATION   FOR SEXUAL HARASSMENT<br>42 USC 1983<br>PLAINTIFF DEMANDS<br>                TRIAL BY JURY |

### COMPLAINT

**TO THE HONORABLE COURT:**

 **COMES NOW** Plaintiff Carmen de Lourdes Caez through her undersigned attorneys, and respectfully **ALLEGES** and **PRAYS** as follows:

### INTRODUCTION

This lawsuit is the second chapter of litigation Defendants have obligated Carmen de Lourdes, Ph.D. to file because nothing, not negative press coverage, not a $50,000 fine from the Women's Advocate's office, not a Senate investigation culminating in a referral to the Puerto Rico Department of Justice, not that prior lawsuit serves to deter Defendants Defendant, but a new Defendant whose continuing misogynistic conduct exemplifies the milieu all Defendants occupy.

1

Did Senator Juan Dalmau call out the university for having such miserable systems for reporting sexual harassment that students identify sexual aggressors on the bathroom walls? The scandal is saying so, not the reality. Did the professor designated to distribute classes for this academic year do so to the exclusion of Dr. Caez despite her being ranked fourth on the list to receive classes? It is too late to say so. Did another professor seek to deprive Dr. Caez of the research assignments she did receive so that her designation as persona non grata for shining light on the unceasing retaliation just breeds new retaliation? It is Dr. Caez and any other victim of sexual harassment who must learn to be silent because Defendants will be ever vigilant in their efforts to silence them. The University's response to Dr. Caez' complaints in multiple fora amounts to deliberate indifference to discrimination.

## I. JURISDICTION

1.      This suit is brought and jurisdiction lies pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq; 28 U.S.C. 1331 and 1343; under the Civil Rights Act of 1991; and under Title IX of the educational amendments 20 U.S.C. §1681.  This Honorable Court's jurisdiction over state law claims is invoked pursuant to the doctrine of pendent or supplemental jurisdiction.

2.      The following local laws are20 U. invoked:; Law 17, 29 Laws of P.R. Anno. 155 et seq., Articles 1802 and 1803 of the Civil Code of Puerto Rico, and Law 115.

3.      The proper venue for this case lies in this Court, as the defendants are all residents of Puerto Rico, and the causes of action took place in Puerto Rico.

## II.   **PARTIES**

5.      Plaintiff Carmen de Lourdes Caez is of legal age, a United States citizen,

single, and a resident of Puerto Rico. At all times relevant to the instant Complaint, plaintiff

was an individual protected by the laws invoked in this Complaint.

6.      Defendant, Universidad de Puerto Rico is an employer with more than 500

employees that intentionally retaliated against Ms. Caez over and over again for

reporting that a supervisory professor had sexually harassed her to the university

and to the Puerto Rico Senate and to the news media and for filing a lawsuit in this

Court.

7.      Defendant Professor Walter Mucher, at all relevant times, acted under color of law

as defined under 42 U.S.C. §1983. His spouse, Jane Doe, and their conjugal

partnership are sued as necessary parties.

8.      Defendant Professor William Rios at all relevant times, acted under color of law as

defined under 42 U.S.C. §1983. His spouse, Susan Roe, and their conjugal

partnership are sued as necessary parties.

9.      John Doe is a person, currently unknown, who may have responsibility for the

facts set out in this Complaint.

10.     Corporation ABC is any entity that may have responsibility for the facts set

forth in this Complaint.

11.     Insurance Company DEF is any insurance company that may have issued a

policy covering the events set forth in this Complaint.

## THE FACTS

16.    Professor Caez was hired by the la Universidad de Puerto Rico as a contract professor in January 2001.

17.    Professor Caez performed her work in an exemplary fashion.

18.    In fact, Professor Caez has been awarded two prizes for the quality of her research.

19.    On March 17, 2016, Professor Caez was meeting with Defendant Professors Lugo y Hernández, working.

20.    Professor Hernández left the meeting, and Professor Lugo took advantage of his absence, and grabbed Professor Caez's arms, saying, could I give you a kiss.

21.    Before Professor Caez could answer,  Professor Lugo kissed her on the cheek.

22.    Then Professor Lugo told Professor Caez that he wanted to give her a kiss on the lips and tried to do so.

23.    Professor Caez tried to move away from Professor Lugo, and he said, "relax, its Social Friday [an expression in Puerto Rico, that refers to Friday being the day before the weekend, when people can loosen up.]

24.    Colloquially, Social Friday's loosening up can refer to men and women becoming intimate.

25.    After Professor Caez resisted the kiss on the lips, Professor Hernández returned to the office.

26.    Professor Lugo acted as if nothing had happened.

27.     Professor Caez left the office and entered the office of the Humanities Department.

28.     Professor Caez was nervous, trembling.

29.     She entered the department office and ran into a secretary, who she told about the assault.

30.     The secretary told Professor Caez to wait so that she could speak to the director.

31.     Professor Caez just wanted to leave.

32.     Professor Caez went home, and, at 6:00 pm, Defendant Hernández called her.

33.     Professor Caez told Professor Hernández what had happened.

34.     Professor Hernández was alarmed and stated that he would speak to Professor Lugo on Monday, March 20.

35.     Professor Caez contacted two members of the Personnel Committee of the Universidad de Puerto Rico during the weekend. They told her that they were sorry it happened, and nothing more.

36.     Monday March 20, 2016 Defendant Hernandez spoke with Professor Lugo, according to what Defendant Hernández told Professor Caez.

37.     Defendant Hernández informed Professor Caez that Professor Lugo admitted that he had tried to kiss Professor Caez.

38.     Defendant Hernández asked Professor Caez to write a letter, explaining what had happened because he had spoken to the then Dean, Defendant Raúl Castro, and that was what the procedure required.

39.     Professor Caez delivered the letter on April 5, 2016.

40.     It was difficult for Professor Caez to draft the letter because doing so made her remember her feeling of disgust caused by the assault.

41.     Two week later, Defendant Hernández called Professor Caez to tell her that Defendant Castro indicated to Hernández that he should resolve the matter at the department level.

42.     That decision by Defendant Castro violated the UPR's anti sexual harassment policy, which provides that all sexual harassment claims should be reported to the human resources department.

43.     Professor Caez could not believe that Defendant Castro was minimizing Professor Lugo's sexual assault of her and refusing to investigate, but, at that time, she remained silent.

44.     Professor Caez was afraid given her position as a contracted professor and not a regular employee with tenure.

45.     By 2017, Professor Caez had been a contract professor for 15 contracts, even though the UPR's hiring policy provides that after 4 contracts, the university should offer the professor a tenured position or stop giving her contracts, on information and belief, precisely because of the vulnerability created by the year after year after year of one year contracts.

46.     On information and belief, it is Defendants' policy to keep professors under contract rather than give them tenure so that they feel intimidated without the right to due process and to silence them from reporting illegal conduct.

47.     No UPR official, including, but not limited to the Personnel Committee, except, unbeknownst to Professor Caez at the time, Professor Carlos Casanova, intervened in any way to provide due process to Professor Caez.

48.     In mid-May, Professor Emmanuelli, a faculty member, approached Professor Caez's office to tell her that she should not feel bad about what had happened and that she should understand that Professor Lugo was attracted to Professor Caez and that he did not know how to express his feelings.

49.     Professor Emmanuelli also told Professor Caez that if Professor Caez liked, the three of them could meet to resolve the "misunderstanding."

50.     Professor Caez notified Defendant Hernández about Professor Emmanuelli's conduct, and the director told Professor Caez that Professor Emmanuelli should not have intervened in that way and that Professor Caez should ignore her.

51.     On information and belief, Defendant Hernández had not even told Professors Lugo and Emmanuelli that they should not speak about the sexual assault as if it were acceptable conduct.

52.     To the contrary, Defendant Hernández made Professor Caez responsible for handling the situation.

53.     A few days later, Professor Caez received a message from Professor Lugo in which he said that such a long-standing friendship should not end because of what had happened.

54.     Professor Caez called Defendant Hernández by phone and told him that Professor Lugo had sent her that message and that she did not want Professor Lugo to come near her.

7

55.     Without recognizing that the message was another admission that the assault occurred, Defendant Hernández met with the two of them and told them that the situation was very delicate and that Professor Caez had asked him to tell Professor Lugo to leave her alone.

56.     The UPR later, at the hearings that the Puerto Rico Senate held about this matter, characterized this meeting as one at which Professor Caez and Professor Lugo "apologized to each other." One can hardly fault Senator Zoe Laboy for rolling her eyes.

57.     Thus, Defendants did not investigate Professor Lugo for his sexual assault nor was he sanctioned for lying in the pre-investigation which occurred to determine if a formal investigation was necessary.

58.     As Defendants intended, Professor Caez felt humiliated and at the same time thought that since she was a contract professor, if she insisted on her complaint that her job would be at risk.

59.     Defendants forced Professor Caez to put up with a silence her pain resulting from Professor Lugo's sexual assault and the lack of seriousness – in violation of Title IX of the educational amendments, Title VII, Law 100, Law 17, among others, with which Defendants treated her complaint.

60.     Professor Lugo's sense of impunity was so severe that in the second semester of 2017 he invited Professor Caez to go to lunch with him, knowing that that invitation was an undesired approach.

61.     In the semester starting in August 2017, the Personnel Committee's composition changed.

62.     Therefore, on November 20, 2017, Professor Caez decided to take the risk – which is how Defendants made her feel – to tell Professor Yamila Bauzá and Professor Casanova so that they could provide her guidance.

63.     Professor Caez was not able to do so earlier because of the academic recess caused by Hurricane María.

64.     Professor Bauzá and Professor Casanova explained to Professor Caez that the UPR has a protocol and a sexual harassment policy, which were not followed in her case.

65.     Professor Caez decided that it was time to try again to denounce what had happened.

66.     Professor Casanova spoke to the current department director, Defendant Dr. Walter Mucher to ask if he knew about the assault.

67.     Next the department secretary asked Professor Caez for a copy of the letter she sent on April 4, 2016.

68.     After Dr. Caez complained of Professor Lugo's sexual harassment, the UPR promoted him to be a tenured professor.

69.     On December 18, 2017, Professor Caez delivered a sworn statement as required to initiate the UPR's sexual harassment protocol to the Department of Human Resources, stating the details of the assault yet again.

70.     When Dr. Caez delivered the letter to the Human Resources Director, that director told Dr. Caez that she was lucky because people who complained about sexual harassment were usually killed.

9

71.     The investigative Process was finally initiated, and, as a result, the UPR found that Defendant Lugo had sexually assaulted Professor Caez.

72.     Defendants punished Defendant Lugo by suspending him from work and pay for six months, beginning in January 2019.

73.     In August 2018 the UPR informed Professor Caez that it was not going to renew her contract, with the pretext of lack of funds.

74.     Professor Caez had worked for the UPR for 17 years and 5 months without a complaint against her of any kind.

75.     In the fall of 2018 the UPR substituted Dr. Caez with a professor who had less seniority, fewer publications, and less conferences, even though Professor Caez specialized in the area – European history – that the department needed.

76.     Moreover, the UPR gave contracts to Professor Alsina, who teaches French and only French.

77.     The UPR gave a contract to Professor Pedro Rosario, who does not have a Ph.D. and no plan for getting one, as the UPR's rules require.

78.     The UPR gave a contract to Professor who teaches art history, three classes each.

79.     The university gave the latter two professors those three courses plus three courses of humanities each.

80.     A full load is four classes.

81.     The university could have complied with its difficult hire situation and its sexual harassment policy by giving Professors Alsina and Rosario the three classes in their

respective specialties and one more class of humanities and giving Professor Caez four classes in humanities.

82.    Instead, the University decided to violate its policy.

83.    Under what the UPR calls its objective criteria, Professor Alsina scores a 1.57; Professor Rosario scores a 2.67; Professor Coll scores a 1.97; Professor Tirado scores a 3.32; and Dr. Caez scores a 3.33.

84.    Based on that criteria, Alsina, Rosario, and Coll should have received contracts based on the difficulty in recruiting professors in their fields.

85.    Between Professor Tirado and Dr. Caez, the UPR should have given the contract to Dr. Caez and not Professor Tirado.

86.    The UPR's explanation for not renewing Dr. Caez' contract is false.

87.    According to Professor Casanova's testimony and written remarks before the hearing the Puerto Rico Senate held on the matter, the Personnel Committee altered the hiring rubric it had created in 2003 without calling a formal meeting to vote on the changes as the university's rules required.

88.    The intent of the changes was to exclude Dr. Caez from the professors contracted for the 2018-2019 year.

89.    Dr. Casanova stated that Dr. Caez' complaint alone should have precluded the University from failing to give her a contract for the 2018-2019 year.

90.    Dr. Casanova asked Professor Mucher six times to hold a meeting of the tenured professors before the contracted professors were selected for the 2018-2019, but Professor Mucher never convoked the group.

91.    After the 2006-2007 academic year, to perform the position of professor or researcher, the person shall have, at least, have a doctorate degree, or an equivalent title in areas that qualify the person for the material taught, research, or under her charge.

92.    Section 42.1.5. provides an exception to the requisite set forth in the prior paragraph, indicating that a person without a doctorate degree can be hired as a professor, or research, but only if the department agrees on a plan of studies with the person so that she can complete her doctorate degree with a reasonable period of time, depending on the particular discipline.

93.    Professor Mucher, acting in his capacity as the Department Director of Humanities at the UPR failed to comply with this requisite.

94.    Professor Mucher offered a contract position as a professor to Pedro Rosario, who has a master's degree, not a doctorate, without developing any plan for that candidate to obtain his doctorate within a reasonable period of time.

95.    Professor Mucher placed Professor Rosario at number 2 of the contract candidate list, even though his overall score – according to the scale Professor Mucher developed without regard to the existing one or the need to have a new scale approved by the committee of tenured faculty -  was 2.67, and Dr. Caez' score was 3.33.

96.    Dr. Casanova pointed out to Professor Mucher that the manner in which Mucher created the list of eligible professors for the 2018-2019 academic year was plagued with errors.

97.    Because the dean refused to meet with Dr.s Casanova and Bauza, who understood the 2003 rubric, the UPR used Professor Mucher's flawed rubric and retaliated against Dr. Caez for her complaint.

98.     In his prepared remarks for the Senate committee, Dr. Casanova indicates that he also feared the retaliation because in the past Dr. Caez had had to file a complaint against a different professor, William Rios, who insisted on having his girlfriend, who was a university in his shared office with Dr. Caez almost constantly.

99.     Dr. Caez complained first to Dr. Rios, who ignored her, and then she went to Harry Hernandez, then the department head and then Raul Castro, the academic dean.

100.    Dr. Caez was concerned because she sometimes had students come to the office to talk to her about their grades, and the Buckley law prohibited speaking about one student's grade in front of another student.

101.    Both Dean Castro and Dr. Casanova asked Dr. Rios to limit his girlfriend's visits to his office, but he ignored both of them.

102.    More recently, as discussed below, Dr. Rios has demanded that Dr. Caez not be given research assignments.

103.    Given the administration's refusal to meet with him and Professor Mucher's refusal to call a meeting of the tenured professors to discuss any proposed changes to the recruiting policies and procedures, Dr. Casanova understands that Professor Mucher manipulated the rubric in order to retaliate against Dr. Caez for insisting on reporting on Professor Lugo's continued sexual harassment of her.

104.    As Professor Caez had feared, Defendants retaliated against her for exercising her rights.

105.     Professor Caez approached Defendant interim Rector Glorivee Rosario,  and Defendant Irmannette Torres, interim dean, who told her that they did not even have to listen to her because she had no relationship with the UPR any more.

106.     This reaction violated the UPR's sexual harassment policy Article IX, D: "If the claimant is a contractor or a visitor, her claim should be referred to the Human Resources Office of the institutional unit where the facts subject of the complaint occurred."

107.     Professor Caez was destroyed by their reaction.

108.     Subsequently the UPR offered Dr. Caez two courses on two different days.

109.     UPR had never just canceled Dr. Caez' contract and, then, a month later, after the other universities had stopped hiring, offered her just two courses as it did for the academic year 2018-2019.

110.     If Dr. Caez had had time to apply elsewhere, she could have complemented that schedule.

111.     As it was, Dr. Caez knew she had to look for other full time work because there was no longer any other university work available.

112.     Moreover, as Senator Juan Dalmau stated during the hearings at the Cayey campus, that "after a professor complains, the UPR does not renew the contract, [with each side having its explanation for that non-renewal] The message sent to a professor is that if you complain, there are consequences. It is better to keep quiet."

113.     The UPR has tried to justify the nonrenewal of Dr. Caez' contract by saying that the budget was reduced, but the UPR's budget has subsequently been cut more severely, and the UPR keeps granting contracts.

114.     The UPR is being deliberately indifferent to the discrimination and retaliation of Dr. Caez because of her sexual harassment complaints.

115.     The UPR did not fail to renew Dr. Caez' contract because of unavailability of funds. UPR had the money for four professors, and Dr. Caez had the best qualifications based on the UPR's standards, even as altered to exclude her.

116.     As a result of this situation, Professor Caez approached various governmental agencies.

117.     Among other places, Professor Caez went to the office of then State Senator Zoé Laboy.

118.     Senator Laboy scheduled hearings at the Cayey campus of the Universidad de Puerto Rico.

119.     Professor Caez testified in public hearings about the discriminatory treatment to which she had been subjected by Defendants.

120.     The UPR was deliberately indifferent to the complaint Dr. Caez presented to the Senate committee.

121.     There was significant press coverage of the public hearings.

122.     The UPR was deliberately indifferent to this medium of complaint.

123.     According to Dr. Casanova, UPR officials, including Professors Hernández and William Rios, altered official documents to justify the cancellation of Professor Caez's contract.

124.     Dr. Casanova also testified to an incident of a student, presumably so distraught because no one would listen to her complaint of sexual harassment that she put posters up of Professor Rios, captioned with "Sexual Aggresor."

125.     The UPR did not investigate this incident.

126.     During the Senate hearings at the Cayey campus, Senator Juan Dalmau stated that in the bathrooms on campus, students identified certain professors as sexual aggressors and warned other students to avoid those professors.

127.     This sort of communication was apparently necessary because the normal channels at the UPR were worthless.

128.     Due to Professor Caez's complaints, President Jorge Haddock initiated an investigation from the presidency.

129.     As a result of that investigation, the president determined that the university's protocols had been violated.

130.     There were recommendations of sanctions for Professor Harry Hernandez and Professor Raul Castro that have not been implemented.

131.     Nonetheless, the investigation was incomplete because of the accusations of retaliation were never investigated.

132.     Moreover, the investigation determined that Professor Caez rejected a reasonable accomodation, when it was Professor Caez who requested an accommodation as to her schedule, which the UPR eventually provided.

133.     In December 2018, Professor Mucher informed the faculty that the UPR had given a contract to Anabel Lopez Lopez, who was less qualified that Dr. Caez.

134.     Based on an investigation of Dr. Caez' case, the Women's Advocate's Office fined the UPR $10,000 for violating the policy; for failing to train staff as to the policy; and for not having an adequate policy.

135.     In 2023, Dr. Caez received two literary prizes for her research.

136.     After having her contract not renewed in the 2018-2019 year, Dr. Caez received some classes. But for the first semester of the 2023-2024 academic year, after the UPR gave Dr. Caez just one class to teach, Professor Mucher stood outside Dr. Caez' door and asked other professors if they wanted more classes.

137.     Professor Mucher acted in this fashion at the very time the UPR was drafting its motion for summary judgment to file in Dr. Caez' first federal lawsuit with Professor as the only person providing a statement as to the facts of the case.

138.     Dr. Caez did receive six credits for additional research projects for the 2022-23 academic year.

139.     Dr. Rios sent a letter to the Juan Caraballo, the academic dean, questioning why Dr. Caez was given a class to teach and given the credits for research.

140.     Thus, the UPR's retaliation is ongoing, and Dr. Caez respectfully asks this Court to order it to stop.

141.     Dr. Caez attempted to set forth these most recent incidents together with additional background material in the original case filed, 20-1003 (GMM), but the Court ruled that it was too late procedurally to add those new facts.

## FIRST CAUSE OF ACTION

### (42 U.S.C. § 1983 First Amendment)

142.   Plaintiff incorporates the preceding paragraph as if re-alleged in full.

143.   Since Defendants retaliated against Professor Caez for exercising her right to free expression about a matter of public importance by not renewing her contract because of her complaint.

144.   Professor Walter Mucher offered courses to other professors but not to Dr. Caez in December 2022 in retaliation for her complaining about sexual harassment.

145.   When Professor Rios, the head of the tenured faculty committee, learned that Dr. Caez had received a full work load for the academic year of 2022-23 by receiving research assignments in addition to classes, he complained to the academic dean. He did so in retaliation for Dr. Caez' complaint of sexual harassment.

146.   Defendant UPR has policies and procedures which intentionally or not discriminated against Professor Caez, for exercising her right to free expression.

147.   As a result of the above, Professor Caez has the right to be paid by Defendants the following damages:

a)   Lost income during the time the contract was cancelled, which exceed $150,000.00 plus interest and any other benefit provided by law.

b)   Emotional damages for the retaliation in violation of the First Amendment for an amount not less than $1,000,000;

c)   Punitive damages in Accord with federal law for violation of the First Amendment.

d)   Attorneys' fees pursuant to 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

## ( 42 U.S.C. § 1983 XIVTH Amendment)

148.   Plaintiff incorporates the preceding paragraphs as if re-alleged in full.

149.   Because defendants failed to provide or did not use procedures that addressed Professor Caez's complaint, she suffered emotional harm due to working in a hostile environment without hope of a way for an amount of not less than $500,000.

150.   Defendants are also liable for punitive damages for violating the 14th Amendment in an amount of not less than $500,000.

151.   The UPR should be enjoined to implement policies and procedures that work to address sexual harassment effectively.

152.   Defendants should pay attorneys' fees in accord with 42 U.S.C. § 1988.


**THIRD CAUSE OF ACTION**

**TITLE IX OF THE EDUCATION AMENDMENTS 20 U.S.C. §1681 ET SEQ**


153. Plaintiff incorporates as if realleged the preceding paragraphs with the same force and effect as if herein set forth.

154. Defendant Universidad de Puerto Rico has for years been deliberately indifferent to Dr. Caez' complaints of retaliation, in that manner discriminating against her based on her gender.

155.  La Universidad de Puerto Rico should compensate Dr. Caez in an amount not less than one million dollars for this continuing retaliation and discrimination.

**FOURTH CAUSE OF ACTION**

**TITLE VII RETALIATION FOR REPORTING A HOSTILE ENVIRONMENT CREATED IN REPRISAL FOR REFUSING HER SUPERVISOR'S SEXUAL ADVANCE**


156. Plaintiff incorporates as if realleged the preceding paragraphs with the same force and effect as if herein set forth.

157. Because defendant created a hostile environment,  and harassed Professor Caez in retaliation for her complaints about the hostile environment it was illegal and discriminatory and defendant made the decision to harass and eventually not renew Professor Caez' contract without just cause, defendant UPR violated Title VII with knowing and reckless disregard of said Act's proscriptions.

158. The defendants engaged in policies and practices which willfully, or in the alternative unwillfully, discriminated against the plaintiff, Professor Caez on the basis of her sexual harassment complaint and her complaints about the hostile environment created by the UPR.

159. Professor filed timely charges of discrimination with the Equal Employment Opportunity Commission and will have met all administrative prerequisites for bringing this action.

160. The UPR employs over 500 employees.

161. The Equal Employment Opportunity Commission took jurisdiction of the case, and issued a right to sue letter, which Ms. Caez received on October 22, 2019.

162. Plaintiff is within the protected group covered by the Civil Rights Act of 1964.

163. As a result of the before mentioned, Professor Caez is entitled to be paid by defendant UPR the following damages:

    a      Compensatory damages for the emotional and physical harm suffered;

    b      backpay and front pay;

    c      Punitive damages;

    d      Attorney fees;

    e      and any other benefits allowed by law.

152.   All of the previously mentioned acts of the defendants violated Title VII, and the other federal laws previously cited.  As a result, Professor Caez also asks this Honorable Court to order the UPR to grant her tenure, which means that she would be absolved of evaluations, which are used to continue reprisals.

## FIFTH CLAIM FOR RELIEF
### (LAW 115 - P.R.)

164. Plaintiff incorporates the preceding paragraphs as if alleged in full.

165.   Defendants' acts violate Law 115 intentionally, or, in the alternative, without intent because they retaliated against Professor Caez over and over and over again for complaining of illegal conduct.

166.   As a result, Plaintiff has a right to be compensated as follows:

a)      Lost income in an amount not less than $150,000. That amount should be doubled by law.

b)      An amount not less than $2,500,000.00 for emotional damages and mental anguish. That amount should be doubled as the law requires.

c)      Any other damages permitted by the law.

## SIXTH CAUSE OF ACTION

### ( Law 17 of April 22,  1988)

167. Plaintiff re-alleges the preceding paragraphs in full.

168.   As a result of the aforementioned acts and omissions, Defendants have committed sexual harassment and inflicted emotional humiliation, harassment, and mental anguish to the Plaintiff in an amount in excess of $500,000.  Plaintiff has suffered enormously due to the discriminatory actions of Defendants. Any amount awarded should be doubled by law.

169.   In addition, Defendants should compensate Professor Caez for lost income for the failure to renew her contract in retaliation for her complaint. Such amount should be doubled by law.

## TRIAL BY JURY

158.   Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiff very respectfully asks this Court to grant the relief sought in this Complaint and order Defendants  to

**a)**   Pay the lost income of more than $150,000.00 doubled by law and any other benefit permitted in law;

**b)**   Pay for emotional damages for the retaliation under the First and Fourteenth Amendments, Title VII, and Law 17 in an amount not less than $500,000 double pursuant to Law 115;

**c)**   Punitive damages of not less than $1,000,000;

**d)**   Attorneys' fees pursuant to 42 U.S.C. § 1988 and Title VII;

**e)**   require the Universidad de Puerto Rico to implement effective policies and procedures for the investigation of sexual harassment, with warnings about the consequences involved and protection for victims that take the risk of filing a complaint;

e)   and any other remedy allowed by law.

**RESPECTFULLY SUBMITTED**

In San Juan, Puerto Rico this 27th of April 2023.

/s/Jane Becker Whitaker
USDCPR 205110

**BECKER VISSEPO**
P.O Box 9023914
San Juan, PR  00902-3914
Teléfono (787) 945-2406
jbw@beckervissepo.com